```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION

John R. Tomlinson,             :

        Plaintiff,             :

    v.                         :    Case No. 2:09-cv-0125

Director Terry Collins,        :    JUDGE HOLSCHUH
et al.,

        Defendants.            :
```

## REPORT AND RECOMMENDATION

This civil rights action was filed by John R. Tomlinson, formerly a state prisoner, and arises out of an alleged lack of medical care provided to Mr. Tomlinson while he was imprisoned. On July 9, 2010, in accordance with the Court's scheduling order as amended, defendants Terry Collins, John DesMarias, Dr. Ikenna Nzeogu, Karen Stanforth, and Dr. Sajjad Siddiqi filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 (c).  Mr. Tomlinson has opposed that motion and defendants have moved to strike certain exhibits attached to Mr. Tomlinson's memorandum in opposition.  Both motions are fully briefed.  For the following reasons, it will be recommended that the motion to strike be denied and that the motion for summary judgment be granted.

## I. BACKGROUND

The following facts are undisputed, except where noted, and are taken from the pleadings, admissions, affidavits, depositions, and other evidentiary materials on file.  In accordance with the applicable standard for summary judgment motions set forth below, the evidence and facts, as well as any reasonable inferences to be drawn from those underlying facts, are considered in the light most favorable to Mr. Tomlinson.

Mr. Tomlinson was incarcerated at the Madison Correctional Institution in London, Ohio, from 2005 to 2008. The defendants

named in his complaint are Terry Collins, formerly the director of the Ohio Department of Rehabilitation and Correction; John DesMarias, the medical director for the Bureau of Medical Services; Ikenna Nzeogu, the chief medical director at MaCI; Dr. Siddiqi, an on-site physician at MaCI; and Karen Stanforth, the health care administrator at MaCI.  Mr. Tomlinson's claim can be summarized as follows.

In July 2007, while participating in a prison softball game, Mr. Tomlinson experienced a very sharp pain and tingling sensation.  His hearing was affected and he felt confused and disoriented.  His motor skill were very limited, and he could no longer pitch.  Although he later batted, he had difficulty running to first base, and required assistance to return to the bench.  Mr. Tomlinson is unsure of whether he went to the infirmary once he arrived back at the dormitory.  He did, however, see Dr. Siddiqi for neck pain and numbness in his left hand on July 30, 2007.  Mr. Tomlinson was still complaining of numbness in his left hand when he saw Dr. Siddiqi again on August 28, 2007.

Mr. Tomlinson's symptoms subsequently subsided, but they recurred whenever he looked up, coughed, or had a bowel movement. A tingling sensation would come over him affecting his neck and shoulders and radiating down his arms.  He did not have any of these symptoms before the softball incident.  The tingling sensation and the pain became progressively worse.

Mr. Tomlinson complained to various medical staff concerning his deteriorating condition.  On October 4, 2007, he filled out a health services request indicating that his condition was getting worse and that walking was increasingly difficult.  His right hand had started to go numb at the fingertips, and he had been forced to drop out of the vocational maintenance program because he could no longer bend or kneel.

In response to Mr. Tomlinson's health services request, another medical appointment was scheduled for October 4, 2007. At that time, Dr. Siddiqi suggested in his progress notes that ulnar nerve entrapment, i.e. a pinched nerve, could be causing plaintiff's problems. An electromyogram was needed before Dr. Siddiq could make a more definitive diagnosis. Mr. Tomlinson underwent the EMG on October 10, 2007, which indicated a left C-8 radiculopathy. Dr. Siddiqi met with Mr. Tomlinson on October 15, 2007, to go over the EMG results. He informed Mr. Tomlinson that he would need physical therapy and neurosurgery, but that there might not be enough time for surgery before Mr. Tomlinson was released from prison on February 21, 2008.

On October 20, 2007, Mr. Tomlinson submitted an informal complaint to Ms. Stanforth regarding the amount of time it was taking to get medical treatment and the type of treatment he was receiving. According to his informal complaint, it had taken months just to obtain an EMG, and physical therapy was being recommended when what was needed was surgery. Ms. Stanforth responded to plaintiff's informal complaint on October 30, 2007, explaining that the usual progression of care for a condition such as his starts with physical therapy which, in many cases, alleviates the pain and the need for back surgery. She offered to meet with him on November 2, 2007, to discuss his concerns.

Mr. Tomlinson filed a second informal complaint on November 4, 2007. He had apparently not yet received the response to his first complaint. He reiterated his disagreement with Dr. Siddiqi's recommendation of physical therapy and his belief that his condition had gotten progressively worse due to the lack of appropriate treatment. Ms. Stanforth responded to this grievance by scheduling Mr. Tomlinson for an appointment on November 23, 2007, with the prison's medical director, Dr. Nzeogu, for a second opinion.

-3-

Mr. Tomlinson went to his physical therapy session on November 4, 2007, but, according to him, the therapist noted in his report that he should first be seen by a neurosurgeon before undergoing any physical therapy.  Mr. Tomlinson filled out another health services request on that same date stating that his symptoms were worsening and that the physical therapist could not treat him in his present condition.  Dr. Siddiqi saw Mr. Tomlinson the next day and reviewed the physical therapist's report.  On November 7, 2007, Dr. Siddiqi requested a neurosurgery consult, and also wrote out a pre-certification request for an MRI of the cervical spine.  He specifically noted on the pre-certification request form that Mr. Tomlinson could not be seen by a neurologist or neurosurgeon unless he had undergone an MRI within the last 12 months.  A neurological consult was scheduled for January 22, 2008, but apparently canceled because the MRI was never done.

On November 23, 2007, Dr. Nzeogu examined Mr. Tomlinson. Dr. Nzeogu's notes from that appointment reflect that Mr. Tomlinson complained of numbness in both hands, especially the left hand, and of intense pain when he moved his neck.  Dr. Nzeogu completed a pre-certification request for a CT scan of the head and cervical spine.  That request, however, was denied because the usual protocol called for an MRI of the cervical spine instead of a CT scan. Although the denial was faxed to Ms. Stanforth on November 30, 2007, Dr. Nzeogu apparently did not find out about it until December 31, 2007.

Mr. Tomlinson saw Dr. Nzeogu again on December 31, 2007, and reported that his symptoms were getting worse and that he was having difficulty holding or clamping objects in his hand.  Dr Nzeogu completed a pre-certification request for an MRI of plaintiff's cervical spine, noting that he needed the results "ASAP."  The request was initially denied, but later approved.

-4-

Unbeknownst to Mr. Tomlinson (and apparently Dr. Nzeogu), the MRI was scheduled for March 24, 2008. When Dr. Nzeogu saw Mr. Tomlinson on January 28, 2008, he discovered that the MRI had still not been done. He put a note in the file to investigate. This MRI was canceled because Mr. Tomlinson was released from prison on February 21, 2008.

Mr. Tomlinson saw his private physician, Dr. Flynn on February 25, 2008. Dr. Flynn immediately ordered blood tests, x-rays, an MRI, and an EMG. He diagnosed Mr. Tomlinson with a displaced disk between the fourth and fifth cervical vertebrae with compression of and damage to the spinal cord. He promptly referred plaintiff to a neurosurgeon, Dr. Buster.

Dr. Buster examined Mr. Tomlinson on March 12, 2008, and performed surgery two days later to correct severe cervical myeloradiculopathy at the C4/5 and C5/6 levels. Mr. Tomlinson experienced immediate improvement in his stability, coordination, motor skills, and walking after the surgery. He felt less pressure and less pain, but still exhibited symptoms such as numbness in his arm and sensitivity and extreme pain in his arm, shoulder, neck, and one side of his chest. A second surgery was performed a few months later in an unsuccessful attempt to decompress plaintiff's spinal cord and alleviate those symptoms.

Mr. Tomlinson reports that his symptoms have actually worsened since the second surgery. He has numbness and a tingling sensation in his left hand and forearm, and, to a lesser extent, in his upper arm and shoulder. Even the most delicate touches to his fingertips cause extreme pain, and his index finger and thumb are the most sensitive. He still experiences shooting pain whenever he raises his arms above his head. His neck is always tight and sore. On the other hand, his movement is much better. He can now walk very fast, but remains unable to run. The headaches and ringing in the ears also continue to

-5-

linger.

## II. <u>STANDARD OF REVIEW</u>

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).  The standard for summary judgment is found in Rule 56 of the Federal Rules of Civil Procedure:

> [Summary judgment] ... should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." <u>Poller v. Columbia Broadcasting Sys.</u>, 368 U.S. 464, 467 (1962)(quoting <u>Sartor v. Arkansas Natural Gas Corp.</u>, 321 U.S. 620, 627 (1944)).  <u>See also</u> <u>Lansing Dairy, Inc. v. Espy</u>, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  <u>Lashlee v. Sumner</u>, 570 F.2d 107, 111 (6th Cir. 1978).  The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Weaver v. Shadoan</u>, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the

initial burden of showing that no genuine issue as to any
material fact exists and that it is entitled to a judgment as a
matter of law.  Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir.
2003).  All the evidence and facts, as well as the inferences to
be drawn from the underlying facts, must be considered in the
light most favorable to the party opposing the motion.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460
(6th Cir. 2001).  Additionally, any "unexplained gaps" in
materials submitted by the moving party, if pertinent to material
issues of fact, justify denial of a motion for summary judgment.
Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

     "[T]he mere existence of *some* alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no *genuine* issue of *material* fact."  Anderson, 477 U.S.
at 247-48 (emphasis in original).  A "material" fact is one that
"would have [the] effect of establishing or refuting one of [the]
essential elements of a cause of action or defense asserted by
the parties, and would necessarily affect [the] application of
[an] appropriate principle of law to the rights and obligations
of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th
Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of
material fact is "genuine" when "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

     If the moving party meets its burden, and adequate time for
discovery has been provided, summary judgment is appropriate if
the opposing party fails to make a showing sufficient to
establish the existence of an element essential to that party's
case and on which that party will bear the burden of proof at
trial.  Celotex, 477 U.S. at 322.  The nonmoving party must

-7-

demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollet, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided by this rule-set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

## III. DISCUSSION

To establish an Eighth Amendment violation for denial of medical care, a prisoner must show that he or she had a serious medical condition and that prison officials displayed "deliberate indifference" to that condition. Estelle v. Gamble, 429 U.S. 97 (1976); Wilson v. Seiter, 501 U.S. 294 (1991). In Farmer v. Brennan, 511 U.S. 825, 839 (1994), the Court adopted "subjective recklessness as used in the criminal law" as the appropriate definition for deliberate indifference. It held that "a prison official cannot be held liable under the Eighth Amendment for

denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. . . ." Id. at 837.  Officials must be aware of facts from which they could conclude that a substantial risk exists and must actually draw that conclusion.  Id.  Prison officials who know of a substantial risk to the health or safety of an inmate are free from liability if "they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Because an Eighth Amendment medical claim must be premised on deliberate indifference, mere negligence by a prison doctor or prison official with respect to medical diagnosis or treatment is not actionable under 42 U.S.C. §1983.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; see also Brooks v. Celeste, 39 F.3d 125 (6th Cir. 1994).

A. The objective component of an Eighth Amendment claim under Napier

In order to satisfy the objective component of an Eighth Amendment claim, a prisoner who complains of a delay in treatment must ordinarily proffer medical evidence showing that such delay caused a serious injury.  Napier v. Madison County, 238 F.3d 739, 742-43 (6th Cir. 2001).  Phrased differently, the prisoner has to show that the delay in treatment made his condition worse and that this worsening of his condition was not, or could not have been, alleviated once treatment was finally provided.  This requirement applies, however, only to deliberate indifference claims involving seemingly minor maladies or where a serious need for immediate or more timely medical care would not be obvious to

-9-

a lay person.  Blackmore v. Kalamazoo County, 390 F.3d 890, 898
(6th Cir. 2004).  It does not apply to claims "where facts show
an obvious need for medical care that laymen would readily
discern as requiring prompt medical attention by competent health
care providers."  Id.  In such cases, unlike Napier, the
constitutional violation does not depend upon any detrimental
effect that resulted from the delay, but rather on the prison
officials' failure to respond to the inmate's obvious and serious
medical needs within a reasonable time, thereby creating a
substantial risk of serious harm.  Id. at 899.  Medical
conditions such as a broken arm or severe and life-threatening
bleeding, for example, would fall into this category.

     Mr. Tomlinson apparently concedes that the condition which
he suffered from (a C-8 radiculopathy) is not the type of
condition which an ordinary person would regard as requiring
immediate medical attention.  Thus, under Napier, in order for
his claim to survive summary judgment he must come forward with
medical evidence showing that the defendants' delay in scheduling
an MRI and an appointment with a neurosurgeon caused him to
suffer residual health problems that would not have occurred but
for the delay.  See Plaintiff's Memorandum in Opposition to
Summary Judgment, p. 12.

     The Court agrees with the proposition that the facts
concerning Mr. Tomlinson's condition prior to his release did not
show a need for immediate treatment that would have been obvious
to a lay person.  Rather, it appears to be undisputed that an MRI
or some similar test was needed before a neurosurgeon could make
the determination that surgery was necessary or recommended.
Unlike the plaintiff in Blackmore, who exhibited classic symptoms
of acute appendicitis, Mr. Tomlinson was not in the midst of an
obvious medical emergency.  See Cain v. Irvin, 286 Fed.Appx. 920,
927 (6th Cir. 2008)(obviousness test is whether a layperson would

perceive the need for immediate medical attention). Consequently, the key issue is whether he has produced any evidence from which a reasonable person could conclude that, by delaying treatment, his condition worsened to the point where the treatment he ultimately received was less effective or less successful than it would have been had he received it sooner.

On this key issue, Mr. Tomlinson has offered his own deposition testimony; an affidavit from Dr. Buster; a July 14, 2010 letter from Dr. Buster to Dr. Flynn; and a written report and affidavit from Henry H. Gary, Jr., M.D., a semi-retired neurosurgeon who practiced neurosurgery for approximately thirty years in Missoula, Montana, and who reviewed Mr. Tomlinson's medical records from ODRC and from the offices of Drs. Buster and Flynn. For the following reasons, the Court finds that none of this evidence creates a factual issue about whether the prison's delay in treating Mr. Tomlinson ultimately harmed him.

Because Mr. Tomlinson is not a medical expert, his testimony on this issue is not legally sufficient to support the claim that the delay in treatment ultimately made his condition less susceptible of being treated successfully when the proper medical procedures were performed. Dr. Buster is a medical expert, so he is a competent witness on this issue. In his letter to Dr. Flynn, Dr. Buster does express an opinion as to whether Mr. Tomlinson's failure to attain a full recovery was due to the delay on the defendants' part in scheduling an MRI of his cervical spine and referring him to a neurosurgeon. As to this issue, Dr. Buster stated that "I believe that prolonged neural compression is more likely to result in permanent defect than had the patient been diagnosed and treated sooner." Similarly, Dr. Gary asserts in his written report that "[f]rom reviewing the medical records, it is my opinion that the surgery that was finally performed was certainly medically necessary and the delay

-11-

in surgery certainly could lead to residuals that may have been prevented by earlier surgical intervention." Dr. Gary's affidavit states that "it is more probable than not that the delay in surgery could lead to residuals that may have been prevented by earlier surgical intervention." The question then becomes whether these opinions are enough to create a jury issue about the detrimental impact of the delay.

Defendants have moved to strike Dr. Buster's letter on the grounds that it was not produced in discovery, is not properly authenticated, and constitutes hearsay. Defendants also seek to exclude the letter, insofar as it relates to "residual effects," on the bases that Dr. Buster is not being used as an expert witness and that his opinion goes to the ultimate issue in this case, which is purportedly beyond the scope of the treatment he rendered on plaintiff's behalf. Defendants maintain that both Dr. Gary's report and affidavit should likewise be stricken. They contend that neither document meets the standards for an expert opinion under Fed. R. Evid. 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Defendants additionally complain that Dr. Gary's report and affidavit do not comply with Fed. R. Civ. P. 26(a)(2)(B). As the Court will explain, it sees no need to strike these materials, but, in weighing their evidentiary value, the Court concludes that they are not probative enough to create a genuine factual issue as to whether any delay in treatment harmed Mr. Tomlinson.

Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

-12-

testimony is the product of reliable principles
and methods, and (3) the witness has applied the
principles and methods reliably to the facts of
the case.

Fed. R. Evid. 702.

The opinions expressed by Drs. Buster and Gary are similar
to those evaluated by the court in McDowell v. Brown, 392 F.3d
1283 (11th Cir. 2004). The plaintiff in that case suffered from
spinal epidural abscess, and the issue in the case was whether a
delay in treatment caused or worsened his injuries. Dr.
Merikangas, plaintiff's expert, testified that the early
treatment of a patient with spinal epidural abscess generally
reduces neurological damage. The district court characterized
this hypothesis as "the earlier, the better" and concluded that
the theory was "too vague" to assist the trier of fact. The
court of appeals agreed and upheld the exclusion of Dr.
Meikangas' testimony. Id. at 1299. The court reasoned that the
"idea of early treatment is well within common knowledge that
would be obvious to the average juror, but has nothing to do with
causation." Id. at 1299-1300. In the absence of testimony
linking the delay to the causation or aggravation of the inmate's
injury, "the earlier, the better" theory would add nothing to the
average juror's understanding. Id. at 1300.

Rule 702 allows the use of "scientific, technical, or other
specialized knowledge" if it "will assist the trier of fact to
understand the evidence or to determine a fact in issue...." Dr.
Buster's opinion that "prolonged neural compression is more
likely to result in permanent defect than had the patient been
diagnosed and treated sooner" appears to be merely a variation in
"the earlier, the better" theory rejected in McDowell. Dr.
Gary's statements that "the delay in surgery certainly could lead
to residuals that may have been prevented by earlier surgical
intervention" and that "it is more probable than not that the

-13-

delay in surgery could lead to residuals that may have been prevented by earlier surgical intervention" are no different. What "could" happen, or what "may" happen, in such cases is not particularly helpful. What did happen is the crucial question. Neither Dr. Buster nor Dr. Gary has expressed the opinion that, in this particular case, it is more likely than not that the delay in arranging for Mr. Tomlinson's MRI and his neurosurgery consult actually caused his condition to be less amenable to treatment once the surgery was actually performed. The general proposition that prolonged neural compression is more likely to result in a permanent defect than had a patient been diagnosed and treated sooner says nothing about whether the delay in this specific plaintiff's diagnosis and treatment actually caused his residual symptoms, and that - not the more general relationship between delays in treatment and the presence of preventable residual injury - is what is at issue here. A jury would not be entitled to find on the basis of these opinions that the delay in treating Mr. Tomlinson's medical condition actually caused him any harm.

The Court notes another failure in Mr. Tomlinson's proof. He was operated on for his radiculopathy on March 12, 2008. In order for him to prove that delaying surgery until this date caused him some preventable harm, he would have to show that the delay in the prison's processing of his request for medical treatment prevented him from being operated on at an earlier date, and that because of the differences in the two dates, the later surgery was not as effective as an earlier surgery would have been. But even if his MRI had been done and he saw the neurosurgeon as scheduled on January 22, 2008, there is nothing to show that he would have been scheduled for surgery prior to his release date. Thus, the delays in treatment he complains of may not have delayed surgical treatment at all. Even if they

-14-

did, the medical opinions he has offered do not shed any light on the question of whether a surgery performed between January 22, 2008 and March 12, 2008 – a period of only seven weeks – would have produced a better outcome.

In the absence of any proof linking the delay in treatment to a specific harm suffered by Mr. Tomlinson, there is simply no evidence in the record which would establish the objective component of an Eighth Amendment claim under <u>Napier</u>.  That failure is dispositive of his claim.  However, in the interest of completeness, and in the event that a reviewing judge might reach a different conclusion on this issue, the Court will also address the subjective element of Mr. Tomlinson's Eighth Amendment claim, which is whether any of the defendants exhibited the type of "deliberate indifference" to his medical needs which would violate the Eighth Amendment.

B. <u>Defendants' alleged deliberate indifference to Mr. Tomlinson's serious medical needs</u>

For any of the defendants to be held liable, he or she must have been aware of a substantial risk to Mr. Tomlinson's health and must have consciously disregarded that risk.  While it may appear from the facts that Mr. Tomlinson's treatment was delayed due to bureaucratic reasons and that no single person ensured that the MRI was performed prior to his appointment with the neurosurgeon, for the reasons that follow, the Court concludes that this scenario is insufficient to establish the personal liability of any of the defendants.  <u>See</u> <u>Gibson v. Matthews</u>, 926 F.2d 532, 534-35 (6th Cir. 1991); <u>Stewart v. Murphy</u>, 174 F.3d 530, 537 (5th Cir. 1999) (each defendant's subjective deliberate indifference must be considered separately).  Liability, if any, must arise from the actions of a given defendant and not from the errors of others.  <u>Gibson</u>, 926 F.2d at 535.  In a similar vein, supervisory liability under §1983 requires that the official in

-15-

question either was personally involved in the allegedly unconstitutional conduct or encouraged or condoned such behavior on the part of subordinates.  Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).

### i. Defendants Terry Collins and John DesMarias

Turning first to former Director Collins and Mr. Desmarias, Mr. Tomlinson concedes that these supervisory officials were not directly involved in his treatment or even knew of his medical complaints.  He nevertheless asserts that they are liable because they knew as a result of a court-ordered stipulation that the ODRC health care system did not meet minimum constitutional standards.  This stipulation, entered in Fussell v. Wilkinson, Case No. C-1-03-704, Southern District of Ohio, Western Division, purportedly laid out a five-year plan to be implemented in four phases to increase medical staffing and training, review and improve medical policies and procedures, provide care for chronic illness, and maintain timely access to medical specialists.  This last consideration included minimizing cancellation of appointments and assuring the timely flow and utilization of information.  All inmates with serious medical needs, including Mr. Tomlinson, were allegedly members of the Fussell class on whose behalf the stipulation was entered.

Defendants contend that the Fussell stipulation should be stricken because, by its own terms, it cannot be used as evidence in any other case or administrative proceeding.  Defendants alternatively argue that even if the stipulation were admissible, it would not tend to show that either Director Collins or Mr. DesMarias were deliberately indifferent to the medical needs of inmates such as Mr. Tomlinson, but rather that they were in good faith attempting to improve the health care system for all prisoners in ODRC's custody.  Lastly, the defendants point out that the stipulation does not include an admission of any

-16-

constitutional violations.

The Court finds that the <u>Fussell</u> stipulation, at most, presents an issue of whether ODRC supervisors such as Director Collins and Mr. DesMarias knew that, in the past, the needs of inmates with serious medical problems were in many cases not being met.  There is no evidence that they were aware of Mr. Tomlinson's serious medical needs or the chain of events characterized by Mr. Tomlinson's counsel as a "tragedy of errors," which caused the delay in his receipt of treatment. Without such knowledge, these supervisory defendants could not have encouraged or condoned any unconstitutional conduct leading to the delay in that treatment.  Furthermore, by entering into the <u>Fussell</u> stipulation, ODRC officials committed themselves to maximizing access to medical specialists and minimizing appointment cancellations.  If anything, the stipulation tends to show that these officials hoped to avoid the kind of bureaucratic mix-ups Mr. Tomlinson encountered in his diagnosis and treatment. The stipulation is therefore not the kind of evidence which could tend to show deliberate indifference on the part of these supervisory officials.

### ii. Defendant Karen Stanforth

Mr. Tomlinson also acknowledges that Ms. Stanforth did not medically treat him at any time.  However, the record shows that, she became aware of his dissatisfaction with his medical treatment after he filed grievances on October 20, 2007, and November 4, 2007.  As noted above, in these grievances, Mr. Tomlinson took issue with the progress of his treatment and Dr. Siddiqi's recommendation of physical therapy instead of immediate surgery.  On October 30, 2007, in response to the first grievance, Ms. Stanforth offered to meet promptly with Mr. Tomlinson to discuss his concerns.  On November 13, 2007, she responded to the second grievance by scheduling Mr. Tomlinson for

an appointment with MaCI's medical director on November 23, 2007. The stated purpose of this appointment was to enable the medical director, Dr. Nzeogu, to render a second opinion.  Mr. Tomlinson argues that she was nonetheless indifferent to his medical needs because she did not have someone call him to the infirmary immediately, rather than more than a week later.

It is clear from both the body of the complaint and his deposition that Mr. Tomlinson faults Ms. Stanforth solely for her alleged failure to take appropriate action once she became aware of his grievances.  Ordinarily, the failure to respond to a grievance is insufficient to impose liability under §1983 because such liability "must be based on active unconstitutional behavior and cannot be based on a mere failure to act."  <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999)(internal citation and quotation marks omitted).  Even if the information in Mr. Tomlinson's grievances was sufficient both to alert Ms. Stanforth that he had a serious medical condition that was not being treated properly, and to trigger a duty on her part to act, her actions were reasonable under the circumstances.  There is no evidence that she knew the brief delay in getting him to the see another physician would be harmful to him or that she simply ignored his condition.  Thus, she did not exhibit the kind of reckless indifference that the Eighth Amendment forbids.

<u>iii. Defendants Dr. Siddiqi and Dr. Nzeogu</u>

In opposing summary judgment in favor of Drs. Siddiqi and Nzeogu, Mr. Tomlinson argues that these defendants knew he needed to be evaluated by a neurosurgeon and that an MRI of his cervical spine was a prerequisite to a neurosurgical consult.  Mr. Tomlinson also claims to have expressed repeatedly to these doctors his fears that if surgery was not performed soon, he might be permanently disabled.  He argues that despite their awareness of his medical condition, both doctors failed to insure

-18-

that Mr. Tomlinson obtained an MRI and an appointment with a neurosurgeon prior to his release.  Because "they kept dropping the ball" and did not follow through with their own directives, Mr. Tomlinson maintains that their treatment of him was "so woefully inadequate as to amount to no treatment at all." Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Mr. Tomlinson admits that Dr. Siddiqi did not know of the need to refer him to a neurosurgeon until October 15, 2007.  At that time, Dr. Siddiqi recommended physical therapy and a neurosurgery consultation.  Over the next month and a half, Dr. Siddiqi saw Mr. Tomlinson several other times.  On November 7, 2007, Dr. Siddiqi requested a neurosurgery consult and an MRI of plaintiff's cervical spine.  Two weeks later, Dr. Siddiqi made a second request for the MRI.  On November 28, 2007, Dr. Siddiqi noted in his progress notes that Mr. Tomlinson still needed to get an MRI.

Dr. Nzeogu presumably was unaware of the need for a neurosurgery consultation until he first examined Mr. Tomlinson on November 23, 2007.  Dr. Nzeogu completed a pre-certification request for a CT scan of plaintiff's head and cervical spine. That request was denied, but Dr. Nzeogu did not see the denial letter until December 11, 2007.  On December 31, 2007, Dr. Nzeogu submitted a pre-certification request for an MRI.  The MRI was scheduled for March 24, 2008, but was canceled because Mr. Tomlinson was released from prison prior to that date.

Mr. Tomlinson is careful not to place all the blame on the two doctors for the delays.  He suggests that a number of factors may have been at work, such as ineffective policies and procedures, untrained and indifferent medical staff, or overloaded schedules at OSUMC.  He does not deny that throughout these systemic delays, he nevertheless continued to receive medical treatment, including regular examinations and

prescription pain medications.  Because he was never provided an MRI and a neurosurgery consult, however, he maintains that his diagnosis and treatment were constitutionally deficient.

Drs. Siddiqi and Nzeogu may only be held personally liable if their own conduct rose to the level of deliberate indifference.  See Gibson, supra.  In this case, even assuming (without proof) that a reasonable juror could find that the doctors knew a delay in obtaining the MRI and the neurosurgery consult presented a substantial risk to plaintiff's health, Mr. Tomlinson has not established a genuine issue of fact as to whether either doctor disregarded that risk.  See Mabry v. Antonini, 289 Fed.Appx. 895, 901, 903 (6th Cir. 2008).

Dr. Siddiqi requested the MRI and caused an appointment to be scheduled with a neurosurgeon at OSUMC.  When he discovered that the MRI was not performed, he made another request and later indicated in his progress notes that the test was still needed. There is nothing in the record suggesting that he had any control over when testing would be scheduled, and he continued to make pre-certification requests, which appears to be all that he had the authority to do.  See id.

Dr. Nzeogu saw Mr. Tomlinson every other week from late November 2007 until his release.  While he apparently erred in requesting a CT scan where protocol called for an MRI to be conducted first, even if this could be considered negligent (and there is no evidence of that), acts of negligence are insufficient to establish deliberate indifference.  Id. at 902. Further, once Dr. Nzeogu was advised of the protocol, he followed up with a request for an MRI, which was eventually scheduled for March 24, 2008.  There is no indication that he was aware that by delaying his request, no MRI would be obtained while Mr. Tomlinson was in custody.

The acts of Drs. Siddiqi and Nzeogu, "when viewed either in

-20-

isolation or under the totality of the circumstances," fail to
meet the standard for an Eighth Amendment violation.  Id.  There
is no dispute that Mr. Tomlinson received medical treatment for
his condition.  "Where a prisoner has received some medical
attention and the dispute is over the adequacy of the treatment,
federal courts are reluctant to second guess medical judgments
and to constitutionalize claims which sound in state tort law."
Westlake, 537 F.2d at 860 n.5.  Despite Mr. Tomlinson's
protestations to the contrary, the medical attention he received
was not so woefully inadequate as to amount to no treatment at
all.

### IV.  RECOMMENDED DISPOSITION

For the foregoing reasons, it is recommended that the
defendants' motion to strike (#52) be denied as to the statements
of Drs. Buster and Gary concerning the potential effects of delay
in Mr. Tomlinson's diagnosis and treatment, but that these
statements be deemed insufficient to create a material issue of
fact.  It is further recommended that the defendants' motion for
summary judgment (#49) be granted.

### V.  PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that
party may, within fourteen days of the date of this Report, file
and serve on all parties written objections to those specific
proposed findings or recommendations to which objection is made,
together with supporting authority for the objection(s).  A judge
of this Court shall make a de novo determination of those
portions of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir.1981).

/s/ Terence P. Kemp
United States Magistrate Judge